**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LEONCIO LARA-ARCINIEGA,<br><br>                    Plaintiff,<br><br><br>v.<br><br><br>CROWN EQUIPMENT CORPORATION<br>and CROWN LIFT TRUCKS,<br><br>                    Defendants. | Civ. No. 06-0020 (DRD)<br><br><br>**O P I N I O N** |

*Appearances by:*

DAVIS, SAPERSTEIN & SALOMON, PC
375 Cedar Lane
Teaneck, NJ  07666
by:  Luis L. Haquia, Esq.
      Terrence Smith, Esq.

        *Attorneys for Plaintiff*

BAINTON, McCARTHY LLC
26 Broadway, Suite 2400
New York, NY  10004
by:  J. Joseph Bainton, Esq.
      Matthew P. Cormier, Esq.
      Mark D. Wessel, Esq.

        *Attorneys for Defendant*

**DEBEVOISE, Senior District Judge**

Defendants, Crown Equipment Corporation and Crown Lift Trucks (collectively "Crown"), have moved, pursuant to Federal Rule of Civil Procedure 56(c), for summary judgment on Plaintiff's negligence, product liability, and breach of warranty claims, or in the alternative, to exclude the testimony of Plaintiff's expert witness.  Crown argues that Plaintiff, Leoncio Lara-Arciniega ("Lara"), has failed to produce evidence of causation and that the expert testimony lacks the indicia of reliability required by Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), and Rule 702 of the Federal Rules of Evidence.  Lara has opposed the motions. Because the Court finds that the methods of Lara's expert bear the requisite indicia of reliability, and because questions of fact exist as to causation, Crown's motions will be denied.

## I.  BACKGROUND

Crown is an Ohio-based company that designs, manufactures, and sells or leases material handling equipment, including the Crown RR 5200 Series—a stand-up rider forklift—throughout the United States.  In addition to design and manufacture, Crown also services the equipment that it sells and leases.  Restaurant Depot, a wholesaler of restaurant supplies and Lara's employer, uses Crown lift trucks to move produce and groceries in its warehouse-style stores.

On May 16, 2005, Lara was injured when he and other Restaurant Depot employees were trying to replace a battery that had become disengaged from its compartment on a Crown RR 5200 Series stand-up rider forklift.  Earlier that month, Restaurant Depot had sent one of its forklifts to a Crown facility for repairs.  As a temporary replacement, Restaurant Depot rented a Crown RR 5210-35 stand-up rider forklift.

On May 16, 2005, Crown delivered the replacement forklift to a Restaurant Depot

location in South Hackensack, New Jersey.  The battery in the replacement forklift was smaller in dimension than the battery for which the battery compartment was designed.  To compensate for the smaller battery, and to prevent the battery from shifting around, Crown mechanics fitted the forklift's left battery retention plate with a spacer.  A spacer is a piece of metal that is welded to the battery retainer plates and prevents the battery from shifting around inside the battery compartment when the forklift is in use.

Batteries in forklifts weigh between 1,500 and 2,000 pounds because they are used to counterbalance the load on the fork when elevated.  The battery in the Crown RR Series 5200 sits on four bearing mounted rollers, which allow one person to easily slide the battery out of the compartment for routine maintenance or charging.  Retention plates form two of the sides of the battery compartment.  Two upper hooks and an angled tab at the bottom hold the retention plates in place.

Because the batteries are on rollers, centrifugal force can cause them to shift within their compartments when the forklift is turning, make the forklift difficult to control.  Therefore, industry guidelines require that there be no more that one-half inch of room for lateral movement within the battery compartment.  Crown asserts that spacers are commonly used to ensure that a battery fits snugly within its compartment.  Jared Getz, a Crown mechanic, testified that as he was installing the battery in the forklift that was rented to Restaurant Depot, he realized that the battery did not fit properly, so he cut a spacer and welded it to the battery compartment, leaving only one-eighth of an inch of space between the battery and the compartment walls.

Lara, however, asserts that no spacers were necessary in the replacement forklift because Crown manufactures retention plates in various sizes in order to accommodate batteries of

different sizes.  In addition to jury rigging the battery compartment, which was designed to hold a 38-inch battery, Lara submits that Crown employees disregarded factory installed warning labels instructing that no battery smaller than a 38-inch battery be used with the replacement forklift.

Upon delivery, the replacement forklift was immediately put to use by Restaurant Depot employees.  Restaurant Depot's records show that on May 16, 2005, the replacement forklift was being operated by Jose Bermeo.  However, discovery revealed that a person named Jose Bermeo lived at the address listed in Restaurant Depot's employment records, but that he was never employed by Restaurant Depot.  Rather, the person working at Restaurant Depot under the name of Jose Bermeo was actually Juan Espinosa, who could not be located during discovery.

Without Juan Espinosa's testimony, it is unclear what caused the forklift's battery to become dislodged from its compartment.  Crown posits that at least one of the battery retention plates must be missing in order for a battery to become dislodged, and therefore speculates that one of the battery retention plates must have been removed from the forklift shortly before the battery became dislodged, although it is unknown how long the battery plate was actually displaced.

According to Lara, there is no dispute: the left side retention plate fell off of the forklift. Lara explains that because of the rollers on the floor of the battery compartment, simply driving around a corner can be enough to eject the battery from its compartment if one of the retention plates is missing.

Neither party disputes, however, that the forklift's battery came out of its compartment after about two-and-a-half hours of use.  No one was injured by the battery becoming dislodged; rather, Lara's injury occurred as Restaurant Depot employees tried to return the battery to its

compartment.

 The accounts of how the Restaurant Depot employees tried to return the battery to its compartment are inconsistent.  Two Restaurant Depot employees, Vincent Pasler and Rafael Fernandez, said that several people tried to lift or push the battery back into the forklift, but it was too heavy.  Adnan Manla and Vincent Pasler said that wooden planks were being used, but another employee, Carlos Gomez, said that no planks were ever used.  Vincent Pasler said someone brought over a battery changer, but Carlos Gomez said that the battery changer could not have been brought to the forklift.  Finally, Rafael Fernandez and Adnan Manla said that a second forklift was being used to lift the battery, but Carlos Gomez said that no other forklift was in the area at the time.

 Lara's account of the incident is somewhat patchy: he cannot remember what caused the forklift's 1600-pound battery to fall onto him, crushing his lower leg between the battery and a wooden pallet.  Lara recalls that he was working with other employees at the time to replace the ejected battery and was possibly holding the battery so that it could be lift by a second forklift.  Lara-Arciniega claims that he has suffered permanent damage to his nerves, tendons, muscles, and skin as a result of the accident.

 At no time did anyone from Restaurant Depot communicate with Crown regarding the incident or requesting advice on how to return the battery to its compartment.  Crown was approached only after Lara was injured.

 Following the incident, a field investigator from Restaurant Depot's workers' compensation carrier visited the accident site.  The investigator took photographs and made a videotape reenacting the accident.  The video shows that the retention plates on the replacement

forklift fell off of the truck with little difficulty, but that the retention plates of another Crown forklift, which was not involved in the accident, did not become displaced, even under a greater amount of force.  Crown, however, asserts that Ron Brewer, a Crown employee with thirty years of experience in the lift truck industry, attempted to replicate the actions recorded in the video more than forty times, but was unable to make the retention plate dislodge.

In December of 2005, Lara filed a seven-count complaint against Crown and John Doe defendants in the Superior Court of New Jersey.  In January of 2006, Crown removed the action to the District Court for the District of New Jersey.  Count I of Lara's complaint charges Crown with negligence.  Count II asserts breach of the implied warranty of merchantability, N.J. Stat. Ann. § 12A:2-314, and that the product was not reasonably fit for its intended purpose within the meaning of the New Jersey Product Liability Act, N.J. Stat. Ann. § 2A:58C-1.  Count III asserts breach of the implied warranty of fitness for a specific purpose, N.J. Stat. Ann. § 12A:2-315, as well as the breach of express and other implied warranties.  Count IV alleges that Crown is strictly liable under N.J. Stat. Ann. § 2A:58C-2 for placing a defective and unreasonably dangerous product into the stream of commerce when feasible and alternative designs were available.  Count V alleges that Crown failed to provide adequate warnings or supply adequate instructions or safeguards regarding the use of the forklift.  Finally, Counts VI and VII assert claims against the John Doe individuals and corporations.

To satisfy his burden of proof on the product liability claims, Lara retained Clifford Anderson as an expert to inspect and evaluate the forklift whose battery caused him injury.  Anderson inspected the forklift on January 29, 2007.  He took photographs and made video recordings in addition to taking measurements of the forklift's components and battery

compartment.  Finally, Anderson investigated the area in Restaurant Depot where the accident occurred and spoke with Restaurant Depot employees.  At the end of his investigation, Anderson concluded, among other things, that the design of the Crown RR Series 5200 lift trucks was defective because the forklifts were not equipped with a battery retainer interlock system, which is an optional feature offered by Crown that renders a forklift inoperable unless both battery retainer plates are properly installed.

## II.  MOTION TO EXCLUDE EXPERT TESTIMONY

Crown has moved to exclude the expert report of Clifford Anderson on the grounds that his opinions are not reliable because they are not based on sound scientific or engineering methodology.  The admissibility of exert evidence is governed by Rule 702 of the Federal Rules of Evidence.[1]  In order for expert evidence to be admissible, it must satisfy three requirements. Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008).  First, the proffered witness must be qualified as an expert.  Id.  Second, the expert must testify about matters requiring scientific, technical, or specialized knowledge.  Id.  And third, the expert's testimony must assist the trier of fact.  Id.

In assessing these three requirements, "a trial judge acts as a gatekeeper to ensure that any

---

[1] Rule 702 states:
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

and all expert testimony or evidence is not only relevant, but also reliable." Pineda v. Ford

Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (citing Daubert v. Merrell Dow Pharms., 509 U.S.

579 (1993)).  There is a strong preference under the Rules of Evidence for admitting any

evidence that may be relevant and assist the trier of fact in reaching a decision.  See Fed. R. Evid.

401 (defining "relevant evidence" as any evidence which has a "tendency to make the existence

of any fact that is of consequence to the determination of the action more probable or less

probable than it would be without the evidence").  Indeed, "Rule 702, which governs the

admissibility of expert testimony, has a liberal policy of admissibility." Kannankeril v. Terminix

Int'l, 128 F.3d 802, 806 (3d Cir. 1997).

## A.  Qualification

      In order for an individual to be qualified as an expert, the person must "possess

specialized expertise." Pineda, 520 F.3d at 244.  The Court of Appeals for the Third Circuit has

construed "special expertise" liberally and has held that a broad range of knowledge, skills, and

training can qualify an individual as an expert.  See In re Paoli R.R. Yard PCB Litig., 35 F.3d

717, 741 (3d Cir. 1994).  Indeed, the Court of Appeals has "eschewed imposing overly rigorous

requirements of expertise and [has] been satisfied with more generalized qualifications." Id.

More generalized qualifications, however, may affect the reliability of the expert's opinion.

      In this case, there seems to be no dispute as to Anderson's qualifications as an expert.

Anderson is a licensed professional engineer, specializing in mechanical engineering.  He

received a Bachelors of Science in Mechanical Engineering Technology from Temple University

in 1978 and a Masters in Mechanical Engineering from Widener University in 1996.  Anderson

has spent his entire professional career in the mechanical engineering field, including serving on

the faculty of Camden County College and Delaware Technical and Community College.

Currently, Anderson is an associate at a forensic firm, specializing in the investigation and

analysis of vehicle, industrial, commercial, and construction accidents.  His curriculum vitae

states that he is experienced in the design, modification, testing, application, repair, maintenance,

and safe use and operation of equipment and systems in these areas.

On the basis of this experience and the lack of dispute, the Court finds that Anderson is

qualified to offer his opinion as an expert in this case.

**B.  Reliable Methodology**

The second consideration—whether the expert will testify about matters requiring

scientific, technical, or specialized knowledge—has been interpreted to mean that "an expert's

testimony is admissible so long as the process or technique the expert used in formulating the

opinion is reliable."  Pineda, 520 F.3d at 244.  An expert's opinion can be deemed reliable if it is

"based on the methods and procedures of science rather than on subjective belief or unsupported

speculation," thereby giving an expert "good grounds" for her belief.  In re Paoli R.R. Yard PCB

Litig., 35 F.3d at 742.

Several factors aid the reliability determination.  These factors include:

> (1) whether a method consists of a testable hypothesis; (2) whether
> the method has been subject to peer review; (3) the known or
> potential rate of error; (4) the existence and maintenance of standards
> controlling the technique's operation; (5) whether the method is
> generally accepted; (6) the relationship of the technique to methods
> which have been established to be reliable; (7) the qualifications of
> the expert witness testifying based on the methodology; and (8) the
> non-judicial uses to which the method has been put.

Jama v. Esmor Corr. Servs., 2007 U.S. Dist. LEXIS 45706, at **6-7 (D.N.J. June 25, 2007).

These factors, however, are not exclusive, nor do they apply to all cases.  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999).  Rather, the test of reliability is flexible—it "grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination."  Id. at 142.

Anderson submitted a preliminary report dated March 13, 2007.  The purpose of Anderson's investigation and subsequent report was to determine whether the Crown forklift was defective in a manner that caused Lara's injuries.  The report concluded that the Crown RR Series 5200 forklift was unreasonably dangerous because it failed to protect people from the hazards associated with battery ejection and because it is not acceptable to make safeguards optional.  The report explained that systems which prevent the operation of a forklift when retention plates are not properly installed are feasible safeguards and were available at the time that the forklift was manufactured; however, the feature was optional.  Therefore, the report continued, had the forklift been equipped with such a system as a standard feature, the incident would not have occurred.  The report also concluded that Crown's failure to provide an available safeguard was a design defect and that the defect in design was the cause of Lara's injuries. Finally, the report concluded that the incident was foreseeable to Crown.

In reaching these conclusions, Anderson relied on his own inspection of the forklift; information collected from the worker's compensation investigation; information about the Crown RR Series 5200 forklifts in general and the replacement forklift in particular, which was provided by Crown; photographs taken of the forklift and the warehouse; interviews and deposition testimony of Restaurant Depot employees; as well as other relevant materials produced during discovery.  Using this information, Anderson assessed the nature of the hazard

and found, based on the National Safety Council Accident Prevention Manual and Crown's own literature, that the manual handling of batteries is a recognized hazard. Indeed, Crown's own literature requires that special equipment be used in a designated area when batteries are to be removed from forklifts.

Anderson then considered the industry standards for the battery compartments of the Crown RR Series 5200 forklifts and the "operational envelope" for the Crown RR Series 5200. The report notes that the Underwriters Laboratories requirements address the risk of battery compartments with respect to fire, electric shock and explosion, but not the risk of ejection. The Underwriters Laboratories does provide design requirements for the battery compartment, which the report recites. The "operational envelope" refers to the mechanical equipment capabilities and structural integrity of the forklift. The report finds that the Restaurant Depot employees were using the forklift within its operational envelope.

The report also contains an analysis of photographs taken of the forklift's battery compartment after the incident, as well as a detailed description of the standard battery compartment on the Crown RR Series 5200 forklifts. The report also describes a battery retainer interlock system which Crown offers as an additional option to its customers. With the battery retainer interlock system, the forklift will not operate if the battery retainer plates are not properly secured. The report posits that the battery ejected because the left retention plate was not secured properly, and therefore concludes that had the forklift been fitted with a battery retainer interlock system, then the battery would not have ejected because the forklift would have been inoperable until the retention plate was secured.

Finally, the report summarizes its findings. It states Anderson's opinions that:

11

(1) Retainer plates should not come off during normal operation, and that, in this case, the hooks and tab on the retainer plate were not bent or deformed.  Thus, the retainer plate itself could not be the cause of the battery's ejection.

(2) The retainer plate came off during normal operation of the forklift.

(3) The right battery retention plate does not permit cocked installation and that it would be reasonable to use similar construction for the left plate to prevent improper installation of the left retention plate.

(4) It is not acceptable practice to make safeguards, such as the battery retainer interlock system, optional features, and because this feature is optional, the Crown RR 5210 Series is defective and unreasonably dangerous.

Crown objects to Anderson's report and argues that it cannot be found to be reliable because it does not identify any applicable design or performance standards, relevant literature, or industry practice.  Crown asserts that industry standards do no support Anderson's opinion that all forklifts should be equipped with a battery retainer interlock system.  Crown also objects to the report because it claims that Anderson made no effort to determine the incidence of similar accidents, either with Crown forklifts in particular or within the industry in general.  Finally, Crown objects to the report because it claims that Anderson conducted no testing, and merely speculated that a cocked retainer plate could not hold a battery in place.  Crown submits the opinion of its own expert, whose testing revealed that a cocked battery plate would hold a battery in place.

While these are all valid objections to Anderson's report, Crown's objections only go to the weight of Anderson's opinions, rather than reliability of the method used to reach the opinion.  The method Anderson used in forming his opinion is unremarkable: he conducted an investigation and, drawing on his knowledge of physics and his experience as an engineer, formed an opinion.  Although Anderson could have done additional tests or conducted additional

12

research, the fact that he did not, does not undermine the conclusion that the methodology he employed was reliable.

It appears that the issue is not Anderson's methods, but rather whether a known safety feature should be optional or standard—Anderson had offered his opinion that this feature should be standard and Crown has disagreed. This is a question of reasonableness that goes to the heart of the case and must be decided by a jury. At trial, Crown is free to present its case that it acted reasonably, based on industry standards and practice, in not equipping its forklifts with a battery retainer interlock system, and Lara is free to present evidence to the contrary.

**C.  Whether Testimony Will Assist the Trier of Fact**

The final factor to the admissibility of an expert's report is whether the opinions will assist the trier of fact. Anderson's report provides an explanation of a possible cause of the battery's ejection and describes available safety features that, had they been installed, likely would have prevented the accident. This information will assist a jury in deciding the substantive questions of this case. Therefore, because Anderson is qualified as an expert, the methods he used in reaching his opinion were reliable, and his testimony will assist the jury in reaching a decision on the merits, the Court finds that, under Rule 702, Anderson's report is admissible.

### III.  MOTION FOR SUMMARY JUDGMENT

Having determined that Anderson's report is admissible, the Court will now consider Crown's motion for summary judgment. Crown has moved for summary judgment on the grounds that Lara cannot prove causation. Causation is relevant to both Lara's contract-based and negligence-based claims for relief.

**A. Summary Judgment Standard**

Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

On a summary judgment motion, the moving party has the burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325. If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine fact issue exists and a trial is necessary. Id. at 324. In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just simply create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. If there are no

14

issues that require a trial, then judgment as a matter of law is appropriate.

**B. Causation**

Crown asserts that summary judgment is appropriate because Lara cannot prove that Crown contributed to, or should be held responsible for, his injuries.  In breach of warranty actions, a plaintiff is entitled to recover for any injury "proximately resulting" from the breach of warranty.  N.J. Stat. Ann. § 12A:2-715(2)(b).  Causation is also "a requisite element of any product liability claim, whether founded upon a strict liability or a negligence theory."  Durand v. Kolcraft, 2007 U.S. Dist. LEXIS 92184, at *6 (D.N.J. Dec. 14, 2007).  In negligence actions, causation requires a showing of both cause-in-fact and proximate cause.  Causation-in-fact, or but-for causation, exists when an act or omission is found to have "played a material part in bringing about an event.  An act or omission is not regarded as a cause in fact of an event if the particular event would have occurred without it."  Fedorczyk v. Caribbean Cruise Lines, 82 F.3d 69, 73 (3d Cir. 1995).  Proximate cause exists when the plaintiff's injury is found to be so connected with a defendant's negligent actions that it is reasonable to hold the defendant responsible for the harm.  It is reasonable to hold a defendant responsible when the defendant's negligent conduct was a substantial factor in bringing about the plaintiff's injury.  See Vuocolo v. Diamond Shamrock Chems. Co., 240 N.J. Super. 289, 294 (App. Div. 1990).

Crown argues that Lara has presented no evidence as to when, or under what circumstances, the replacement forklift's battery retention plate was removed.  Without this evidence, Crown concludes that Lara cannot prove causation.  Although the Crown mechanics maintain that they did not improperly install the retention plate, the evidence presented by Lara could lead a jury to reach the opposite conclusion.  There is testimony that there would have been

no need for the Restaurant Depot employees to touch the forklift's battery retention plates in the two-and-a-half hours that the forklift was in operation after it was delivered to Restaurant Depot and before the battery was ejected from its compartment.  In addition, the parties agree that if the retention plate had been properly installed, then the battery would not have ejected from its compartment.  There is also Anderson's expert opinion that the use of a battery retainer interlock system feature could have prevented the ejection of the battery from its compartment.  This evidence creates a question of material fact as to causation on Lara's claims for relief that must be resolved by a jury.

Crown argues in its reply brief that Lara should not be permitted to rely on statements made in an accident report completed by Bob Bracken, a Crown field service supervisor. According to Crown, the report is inadmissible because the statements contained within the report are hearsay and because Mr. Bracken had no personal knowledge of the incident. However, the report is admissible under either Rule 801(d)(2)(D)[2] as a statement of the party's agent or servant concerning a matter within the scope of the employment.

Mr. Bracken states that Crown has a policy of obtaining, recording and preserving information about the circumstances of accidents of its customers involving Crown forklifts. (Bracken Decl. ¶ 5.)  Indeed, Mr. Bracken keeps a supply of Accident Report Forms with him for the purpose of recording such incidents.  In this case, Mr. Bracken filed the Accident Report as Crown employee, the report concerned a matter within the scope of Mr. Bracken's employment, and the report was filed during Mr. Bracken's employment.  Personal knowledge is not a

---

[2] Rule 801(d)(2)(D) of the Federal Rules of Evidence provides that a statement is not hearsay if the statement is made by "the party's agent or servant concerning a matter within the scope of the agency or employment, [and] made during the existence of the relationship."

requirement of Rule 801(d)(2)(D), nor does it matter that the statements contained in the report were based on conversations with Restaurant Depot managers Ed Perez and Vincent Paseler, neither of whom witnessed the incident.  Therefore, the report is admissible as the statement of a party opponent.

During oral argument, counsel for Crown submitted that a video made by Ron Brewer, the Manager of Operator Training and Assistant to the Product Safety Coordinator at Crown (Brewer Decl. Ex. C), demonstrates Crown's lack of responsibility for Lara's injuries.  The video shows Mr. Brewer testing the retainer plate from the replacement forklift which had been fitted with a spacer.  Mr. Brewer first inserts the retainer plate properly into the battery compartment. Then Mr. Brewer adjusts the retainer plate to a "cocked" position.  With the retainer plate in the cocked position, Mr. Brewer drives the forklift in circles and then manually slides the battery towards the cocked retainer plate.  The battery can be heard crashing into the retainer plate, but in Mr. Brewer's demonstration, the retainer plate never becomes completely dislodged.  Based on this footage, Crown concludes that, even with an improperly installed retainer plate, the battery should not have become dislodged from its compartment.

While this video is strong evidence in support of Crown's position, Lara relies on a video which was made by Samuel Raymond, a claims investigator for Liberty Mutual, Restaurant Depot's worker's compensation carrier, at the Restaurant Depot location on May 19, 2005. (Bainton Decl. Ex. B.)  This video shows the replacement forklift, which bears a hand written note stating, "Dont use Battery Fall's out" [sic].  The video then shows Restaurant Depot employees sliding the battery through the battery compartment towards the retainer plate.  The second time the battery makes contact with the retainer plate, the retainer plate pops out and falls

17

to the floor.   An employee has difficulty replacing the retainer plate.  Once the plate is back in

place, the Restaurant Depot employees again slide the battery towards the retainer plate.  Again,

the retainer plate pops out and falls to the floor.  The video then shows the modified retainer

plate next to another retainer plate which has different hooks for securing the plate to the forklift.

Finally, another forklift is brought over.  The employees slide the battery of the second forklift

against the left-hand retainer plate with much greater force, but the retainer plate stays in place.

     The footage on this video presents evidence which could lead a jury to conclude that the

retainer plate on the replacement forklift was defective.  Together these videos create an issue of

fact that makes summary judgment inappropriate.[3]

     Crown's final argument, that the efforts of the Restaurant Depot employees to return the

battery to its compartment were a superseding cause of Lara's injury, does not eliminate the

questions of fact.  Crown asserts that had the Restaurant Depot employees contacted Crown and

---

     [3] Lara also argues that he should be entitled to rely on the theory of res ipsa loquitur in order to prove his negligence and product liability claims.  Res ipsa loquitur permits a jury to infer negligence after the jury has found by a preponderance of the evidence that (1) the thing that caused the injury was in the exclusive control of the defendant; (2) that the injury was such that in the ordinary course of things, does not occur if the one having exclusive control uses proper care; and (3) that the injury was not due to any negligence on the part of the plaintiff.  In design defect actions, section 3 of the Restatement (Third) of Torts: Products Liability provides an analogue to res ipsa loquitur which allows a jury to infer "that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff: (a) was of a kind that ordinarily occurs as a result of a product defect; and (b) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution."  Restatement (Third) of Torts: Products Liability § 3 (1997).  See also Estate of Knoster v. Ford Motor Co., 200 Fed. Appx. 106, 113 (3d Cir. N.J. 2006); Curtis v. Besam Group, 2008 U.S. Dist. LEXIS 29594, at *24 (D.N.J. Apr. 10, 2008).

     However, because questions of fact exist, making summary judgment is not appropriate, the issue of whether Lara should be entitled to rely on res ipsa loquitur does not need to be addressed at this time.

followed the proper procedures for returning an ejected battery to its compartment, then Lara would not have been injured.  On this basis, Crown concludes that the Restaurant Depot's employees' conduct shields them from liability.

An intervening, or superseding, cause severs the causal connection between the defendant's negligent act and the plaintiff's injury, thereby shielding the defendant from liability. For something to be an intervening cause, it must completely supersede the defendant's conduct as the sole cause of the injury.  An intervening cause only negates a defendant's responsibility for the plaintiff's injury, however, when defendant's conduct does not contribute to the plaintiff's injury in any material way.  If the intervening acts are foreseeable, and the causal chain is not broken, then the defendant would not be relieved of liability by the intervening act.

In this case, if a jury were to believe that the Crown mechanics were responsible for improperly installing the battery retention plate, or that the forklift contained a design defect, then given the construction of the battery compartment, it is foreseeable that the battery would be ejected from its compartment and would need to be restored by the Restaurant Depot employees. Thus, the question of whether the efforts of the Restaurant Depot employees to return the ejected battery to its compartment was a superseding or intervening cause is a question of fact that must be decided by a jury.  Because issues of material fact exist, Crown's motion for summary judgment cannot be granted.

## IV.  CONCLUSION

For the reasons set forth above, Crown's motions to exclude the expert testimony of Clifford Anderson and for summary judgment will be denied.  The Court will enter an order

19

implementing this opinion.

/s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: July 15, 2008